MATTER OF ACOSTA

In Deportation Proceedings

A-24159781

*Decided by Board March 1, 1985*

(1) Construction of the provisions the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268, is left by that agreement to each state that is party to the Protocol; accordingly, the various international interpretations of the Protocol, including the *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* published by the Office of the United Nations High Commissioner for Refugees, are useful tools in construing our obligations under the Protocol, but they are neither binding upon the United States nor controlling as to construction of the Refugee Act of 1980.

(2) An alien in an exclusion or deportation proceeding who seeks to demonstrate eligibility for either asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1982), or withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982), must make two related showings: he must meet his evidentiary burdens of proof and persuasion as to the facts, and he must meet the statutory standards of eligibility set out by the pertinent provisions in the Act.

(3) It is the alien who bears the burdens of proof and persuasion in asylum and withholding of deportation cases and he must establish the facts by a preponderance of the evidence.

(4) In order to meet the statutory standard of eligibility for asylum, an alien must satisfy each of the following four elements in the definition of a refugee created by section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982): (1) the alien must have a "fear" of "persecution"; (2) the fear must be "well founded"; (3) the persecution feared must be "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (4) the alien must be unable or unwilling to return to his country of nationality or to the country in which he last habitually resided because of persecution or his well-founded fear of persecution.

(5) The statutory standard for asylum requires the facts to show that an alien's primary motivation for requesting refuge in the United States is "fear," *i.e.*, a genuine apprehension or awareness of danger in another country; no other motivation will suffice.

(6) The term "persecution" in the definition of a refugee under the Act means harm or suffering that is inflicted upon an individual in order to punish him for pos-

211

sessing a belief or characteristic a persecutor seeks to overcome; the word does not encompass the harm that arises out of civil or military strife in a country.

(7) The requirement of a "well-founded fear of persecution" in section 101(a)(42)(A) of the Act means that an individual's fear of persecution must have its basis in external, or objective, facts that show there is a realistic likelihood he will be persecuted upon his return to a particular country; this requires an alien to show that his fear has a solid basis in objective facts or events and that it is likely he will become the victim of persecution.

(8) In order for an alien to show that it is likely he will become the victim of persecution, his evidence must demonstrate that (1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware, or could easily become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien.

(9) The well-founded fear standard for asylum and the clear probability standard for withholding of deportation are not meaningfully different and, in practical application, converge.

(10) "Persecution on account of membership in a particular social group" refers to persecution that is directed toward an individual who is a member of a group of persons, all of whom share a common, immutable characteristic. *i.e.*, a characteristic that either is beyond the power of the individual members of the group to change or is so fundamental to their identities or consciences that it ought not be required to be changed.

(11) In order for an alien to show persecution on account of "political opinion" within the meaning of the Act, it is not sufficient to show that a persecutor's conduct furthers his goals in a political controversy; rather, the alien must show that it is his own, individual political opinion that a persecutor seeks to overcome by the infliction of harm or suffering.

(12) The requirement that an alien must be unable or unwilling to return to a particular country because of persecution or a well-founded fear of persecution requires an alien to do more than show a threat of persecution in a particular place or abode within a country—he must show that the threat of persecution exists for him country-wide.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection

ON BEHALF OF RESPONDENT:
Evangeline G. Abriel, Esquire
Catherine Lampard, Esquire
Ecumenical Immigration Services, Inc.
821 General Pershing Street
New Orleans, Louisiana 70115

ON BEHALF OF SERVICE:
William M. Darlington
District Counsel

BY: Milhollan, Chairman; Maniatis, Dunne, Morris, and Vacca, Board Members

In a decision dated December 22, 1983, the immigration judge found the respondent deportable pursuant to section 241(a)(2) of the

Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1982), for entering the United States without inspection, denied the respondent's applications for a grant of asylum and for withholding of deportation to El Salvador, but granted the respondent the privilege of departing voluntarily in lieu of deportation. The respondent has appealed from that portion of the immigration judge's decision denying the applications for asylum and withholding of deportation. The appeal will be dismissed.

The respondent is a 36-year-old male native and citizen of El Salvador. In a deportation hearing held before an immigration judge over the course of 2 days in July and August 1983, the respondent conceded his deportability for entering the United States without inspection and accordingly was found deportable as charged. The respondent sought relief from deportation by applying for a discretionary grant of asylum pursuant to section 208 of the Act, 8 U.S.C. § 1158 (1982), and for mandatory withholding of deportation to El Salvador pursuant to section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982).[1] In an oral decision, the immigration judge denied the respondent's applications for these two forms of relief finding that he had failed to meet his burden of proof for such relief. It is this finding that the respondent has challenged on appeal.

In order to be eligible for withholding of deportation to any country, an alien must show that his "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act. We have held, and the Supreme Court of the United States has recently affirmed, that this statutory provision requires an alien to demonstrate "a clear probability" of persecution on account of one of the five grounds enumerated in the Act. *INS* v. *Stevic*, 467 U.S. 407 (1984). The Court has construed the clear probability standard to require a showing that it is more likely than not an alien would be subject to persecution. *Id.* at 424.

In order to be eligible for a grant of asylum, an alien must show he or she is a "refugee" as defined by section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982). *See* section 208 of the Act. That definition includes the requirement that an alien must have "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* section 101(a)(42)(A) of the Act. In *INS* v. *Stevic, supra,*

---

[1] Under the regulations of the Immigration and Naturalization Service, any asylum request made after the institution of deportation proceedings is also considered to be a request for withholding of deportation under section 243(h) of the Act. 8 C.F.R. § 208.3(b) (1984).

the Supreme Court did not find it necessary to construe the meaning of the phrase "well-founded fear of persecution." Rather, the Court assumed for the purposes of analysis that the well-founded fear standard for asylum is more generous than the clear probability standard for withholding of deportation. *INS* v. *Stevic, supra,* at 425.

It has been our position that as a practical matter the showing contemplated by the phrase "a well-founded fear" of persecution converges with the showing described by the phrase "a clear probability" of persecution. *See, e.g., Kashani* v. *INS,* 547 F.2d 376, 379 (7th Cir. 1977); *Matter of Dunar,* 14 I&N Dec. 310, 319-20 (BIA 1973). Accordingly, we have not found a significant difference between the showings required for asylum and withholding of deportation. *Matter of Salim,* 18 I&N Dec. 311, 314 (BIA 1982); *Matter of Lam,* 18 I&N Dec. 15 (BIA 1981); *accord Matter of Portales,* 18 I&N Dec. 239, 241 (BIA 1982).

The United States Court of Appeals for the Third Circuit has agreed with this position, holding that there is no difference between the standards for asylum and withholding of deportation. *Sotto* v. *INS,* 748 F.2d 832, 836 (3d Cir. 1984); *see also Rejaie* v. *INS,* 691 F.2d 139, 146 (3d Cir. 1982). The Seventh Circuit has concluded that the well-founded fear standard for asylum is not identical, but "very similar," to the clear probability standard for withholding of deportation and has described the showing for asylum as one requiring actual persecution or some other "good reason" to fear persecution. *Carvajal-Munoz* v. *INS,* 743 F.2d 562, 574-76 (7th Cir. 1984). This position also appears to have been adopted by the Sixth Circuit. *Youkhanna* v. *INS,* 749 F.2d 360, 362 (6th Cir. 1984). The Ninth Circuit, however, which has indicated that the well-founded fear standard requires a "valid reason" to fear persecution, has concluded that this standard is more generous to the alien than the clear probability standard for withholding of deportation. *Bolanos-Hernandez* v. *INS,* 749 F.2d 1316, 1321 (9th Cir. 1984). In light of the conflicting positions over the standards controlling asylum and withholding of deportation, we shall reexamine our position on the showings required for these forms of relief.

We begin with the understanding that an alien in an exclusion or a deportation proceeding who seeks to demonstrate eligibility for either asylum or withholding of deportation must necessarily make two related showings. First, the alien must go forward with his evidence and initially persuade the immigration judge that the facts alleged to be the basis of the claim for asylum or withholding of deportation are true, *i.e.,* the alien must meet his evidentiary burdens of proof and persuasion. *See generally,* E. Cleary, *McCormick's*

*Handbook of the Law of Evidence* § 336, at 783–85 (2d ed. 1975). Second, the alien must demonstrate that the facts found to be true meet the tests of eligibility for asylum or withholding of deportation set out in the Act, *i.e.*, the alien must meet the statutory standards of eligibility for these forms of relief. *See* sections 208 and 243(h) of the Act.

## THE EVIDENTIARY BURDENS OF PROOF AND PERSUASION FOR ASYLUM AND WITHHOLDING OF DEPORTATION

Case law and the regulations have always made clear that it is the alien who bears the burden of proving that he would be subject to, or fears, persecution. *See INS* v. *Stevic, supra,* at 422 n.16; 8 C.F.R. §§ 208.5, 242.17(c) (1984); *see also Matter of Nagy,* 11 I&N Dec. 888, 889 (BIA 1966); *Matter of Sihasale,* 11 I&N Dec. 759, 760–62 (BIA 1966). However, to date our decisions have not articulated the burden of persuasion an alien must meet in order to convince the trier of fact of the truth of the allegations that form the basis of the claim for asylum or withholding of deportation.

It is the general rule in both administrative and immigration law that the party charged with the burden of proof must establish the truth of his allegations by a preponderance of the evidence. *See* E. Cleary, *supra,* § 355, at 853; 1A C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 5.10b, at 5–121 (rev. ed. 1984).[2] This is the burden of persuasion generally applied to aliens when they seek to prove their admissibility to the United States or when they seek relief from deportation through such means as suspension of deportation under section 244(a) of the Act, 8 U.S.C. § 1254(a) (1982), or adjustment of status under section 245 of the Act, 8 U.S.C. § 1255 (1982). *See Matter of Vorrais,* 12 I&N Dec. 84 (BIA 1967); 1A C. Gordon & H. Rosenfield, *supra,* §§ 3.20d, 5.10b, at 5–121. We see no reason to depart from this burden of persuasion when aliens seek asylum and withholding of deportation. Thus, in such cases we consider it to be incumbent upon an alien to establish the facts supporting his claim by a preponderance of the evidence.[3] *Cf. Bolanos-Hernandez* v. *INS, supra,* at 1320 n.5. In deter-

---

[2] The Service's burden of proving an alien's deportability by clear, unequivocal, and convincing evidence is an exception to this general rule. *See Woodby* v. *INS,* 385 U.S. 276 (1966).

[3] We note that in *McMullen* v. *INS,* 658 F.2d 1312, 1316 (9th Cir. 1981), the Ninth Circuit held that a "substantial evidence" standard of review applies in cases in which aliens seek withholding of deportation under section 243(h) of the Act. *See also Carvajal-Munoz* v. *INS, supra,* at 567. The standard of review employed by a

*Continued*

mining whether a preponderance of the evidence supports an alien's allegations, it is necessary to assess the credibility and the probative force of the evidence put forward by the alien. *See, e.g., Saballo-Cortez v. INS*, 749 F.2d 1354, 1357 (9th Cir. 1984).

In order to prove the facts underlying his applications for asylum and withholding of deportation, the respondent testified, and attested in an affidavit attached to his asylum application, to the following facts. In 1976 he, along with several other taxi drivers, founded COTAXI, a cooperative organization of taxi drivers of about 150 members. COTAXI was designed to enable its members to contribute the money they earned toward the purchase of their taxis. It was one of five taxi cooperatives in the city of San Salvador and one of many taxi cooperatives throughout the country of El Salvador. Between 1978 and 1981, the respondent held three management positions with COTAXI, the duties of which he described in detail, and his last position with the cooperative was that of general manager. He held that position from 1979 through February or March of 1981. During the time he was the general manager of COTAXI, the respondent continued on the weekends to work as a taxi driver.

Starting around 1978, COTAXI and its drivers began receiving phone calls and notes requesting them to participate in work stoppages. The requests were anonymous but the respondent and the other members of COTAXI believed them to be from anti-government guerrillas who had targeted small businesses in the transportation industry for work stoppages, in hopes of damaging El Salvador's economy. COTAXI's board of directors refused to comply with the requests because its members wished to keep working, and as a result COTAXI received threats of retaliation. Over the course of several years, COTAXI was threatened about 15 times. The other taxi cooperatives in the city also received similar threats.

Beginning in about 1979, taxis were seized and burned, or used as barricades, and COTAXI drivers were assaulted or killed. Ultimately, five members of COTAXI were killed in their taxis by unknown persons. Three of the COTAXI drivers who were killed were friends of the respondent and, like him, had been founders and officers of COTAXI. Each was killed after receiving an anonymous note threatening his life. One of these drivers, who died from injuries he sustained when he crashed his cab in order to avoid being

---

court in reviewing our decision is a separate and distinct standard from that imposed upon a party to measure his burden of persuasion on issues of fact. *Woodby v. INS, supra,* at 282–83. Thus, the Ninth Circuit's decision in *McMullen* has no bearing on the issue of an alien's burden of persuasion in withholding or asylum cases.

shot by his passengers, told his friends before he died that three men identifying themselves as guerrillas had jumped into his taxi, demanded possession of his car, and announced they were going to kill him.

During January and February 1981, the respondent received three anonymous notes threatening his life. The first note, which was slipped through the window of his taxi and was addressed to the manager of COTAXI, stated: "Your turn has come, because you are a traitor." The second note, which was also put on the respondent's car, was directed to "the driver of Taxi No. 95," which was the car owned by the respondent, and warned: "You are on the black list." The third note was placed on the respondent's car in front of his home, was addressed to the manager of COTAXI, and stated: "We are going to execute you as a traitor." In February 1981, the respondent was beaten in his cab by three men who then warned him not to call the police and took his taxi. The respondent is of the opinion that the men who threatened his life and assaulted him were guerrillas who were seeking to disrupt transportation services in the city of San Salvador. He also has the impression, however, that COTAXI was not favored by some government officials because they viewed the cooperative as being too socialistic.

After being assaulted and receiving the three threatening notes, the respondent left El Salvador because he feared for his life. He declared at the hearing that he would not work as a taxi driver if he returned to El Salvador because he understands that there is little work for taxi drivers now. He explained that the people are too poor to call taxis. Additionally, he stated that the terrorists are no longer active.

As evidence of the truth of his version of the facts, the respondent submitted a letter from the present manager of COTAXI, stating that the respondent was a member of that organization for 3 years. The respondent also submitted several articles reporting that leftist guerrillas had threatened to kill American advisors and personnel in El Salvador, had launched an offensive in three of the provinces in the country, and had engaged in a campaign designed to sabotage the transportation industry and the country's economy.

The Service did not submit any evidence refuting the respondent's testimony. As required by regulation, the Service did submit a written advisory opinion from the Bureau of Human Rights and Humanitarian Affairs in the Department of State pertaining to the respondent's Request for Asylum in the United States (Form I-589). See 8 C.F.R. §§ 208.7, 208.10(b) (1983). That opinion states that the respondent does not appear to qualify for asylum because he failed to show a well-founded fear of persecution in El Salvador on ac-

count of race, religion, nationality, membership in a particular social group, or political opinion.

The immigration judge found the respondent's testimony sufficient to prove that he was a founder and member of COTAXI but insufficient to prove that he had received several death threats and had been assaulted by guerrillas. The immigration judge did not make any finding that the respondent lacked credibility; rather, he rejected a substantial portion of the respondent's testimony solely because it was self-serving.

While the immigration judge's assessment of the evidence deserves deference, we disagree with his conclusion that the respondent's testimony should be rejected solely because it is self-serving. The respondent described in specific detail the circumstances surrounding the deaths of his three friends shortly after they received threatening notes, the threats he received, and the facts surrounding his assault. His testimony as to these matters was logically consistent with his testimony about the threats made to COTAXI and its members for failing to participate in guerrilla-sponsored work stoppages. Moreover, the respondent submitted objective evidence to establish his membership in COTAXI and to corroborate his testimony that the guerrillas sought to disrupt the public transportation system of El Salvador. Thus, absent an adverse credibility finding by the immigration judge, we find the respondent's testimony, which was corroborated by other objective evidence in the record, to be worthy of belief. It remains to be determined, however, whether the respondent's facts are sufficient to meet the statutory standards of eligibility for asylum and withholding of deportation.

## THE STATUTORY STANDARD FOR ASYLUM

A grant of asylum is a matter of discretion. *See* section 208 of the Act; *INS* v. *Stevic, supra,* at 423 n.18. However, an alien is eligible for a favorable exercise of discretion only if he qualifies as a "refugee" under section 101(a)(42)(A) of the Act. Therefore, that section establishes the statutory standard of eligibility for asylum. The pertinent portion of section 101(a)(42) provides as follows:

The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any

218

person on account of race, religion, nationality, membership in a particular social group, or political opinion.

This section creates four separate elements that must be satisfied before an alien qualifies as a refugee: (1) the alien must have a "fear" of "persecution"; (2) the fear must be "well founded"; (3) the persecution feared must be "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (4) the alien must be unable or unwilling to return to his country of nationality or to the country in which he last habitually resided because of persecution or his well-founded fear of persecution.[4]

(1) *The alien must have a "fear" of "persecution."*

Initially, we note that Congress added the elements in the definition of a refugee to our law by means of the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102. In so doing Congress intended to conform the Immigration and Nationality Act to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"), to which the United States had acceded in 1968. H.R. Rep. No. 781, 96th Cong., 2d Sess. 19, *reprinted in* 1980 U.S. Code Cong. & Ad. News 160, 160; S. Rep. No. 256, 96th Cong., 1st Sess. 4, 14–15, *reprinted in* 1980 U.S. Code Cong. & Ad. News 141, 144, 154–55; H.R. Rep. No. 608, 96th Cong., 1st Sess. 9–10 (1979); *see also INS* v. *Stevic, supra,* at 422–23. Article 1.2 of the Protocol [5] defines a refugee as one who

owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

Compare 19 U.S.T. 6225 with 6261.[6]

---

[4] While the language of section 101(a)(42)(A) excludes from the definition of a refugee any person who "ordered, incited, assisted, or otherwise participated in the persecution of any person," we do not construe this language as establishing a fifth statutory element an alien must initially prove before he qualifies as a refugee. This provision is one of exclusion, not one of inclusion, and thus requires an alien to prove he did not participate in persecution only if the evidence raises that issue.

[5] Article 1.2 of the Protocol largely incorporated the definition of a refugee contained in Article 1A(2) of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("U.N. Convention"), to which the United States was not a party.

[6] Despite Congress' intention to conform our law to the Protocol, the actual definition of "refugee" adopted in the Act differs in several significant respects from that

*Continued*

Since Congress intended the definition of a refugee in section 101(a)(42)(A) of the Act to conform to the Protocol, it is appropriate for us to consider various international interpretations of that agreement. However, these interpretations are not binding upon us in construing the elements created by section 101(a)(42)(A) of the Act, for the determination of who should be considered a refugee is ultimately left by the Protocol to each state in whose territory a refugee finds himself. *See* Young, *Between Sovereigns: A Reexamination of the Refugee's Status*, Transnat'l Legal Probs. of Refugees: 1982 Mich. Y.B. Int'l Legal Stud. 339, 344-45 (1982); Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 1, 3-4 (Geneva, 1979) (*"Handbook"*); *INS* v. *Stevic, supra,* at 428 n.22.

In adding the definition of a refugee to the Act, Congress did not identify what one must show in order to establish a "fear of persecution." The phrase "fear of persecution" is not new to the Act. Prior to 1980, it appeared in former section 203(a)(7), which provided for the conditional admission to the United States of certain aliens if they fled a country because of persecution or "fear of persecution." *See* 8 U.S.C. § 1153(a)(7)(A)(i) (1976) (repealed by the Refugee Act of 1980, Pub. L. No. 96-212, § 203(c)(3), 94 Stat. 102, 107).[7] Former section 203(a)(7) was applied by Service officers in allocating visas to immigrants abroad and by district directors in determining eligibility for adjustment of status under section 245 of the Act. *See, e.g., Matter of Ugricic,* 14 I&N Dec. 384 (D.D. 1972); *Matter*

___

in the Protocol and the U.N. Convention. First, the U.N. Convention excludes from all of its provisions several groups of persons: (1) those who have committed crimes against humanity; (2) those who have committed a serious nonpolitical crime; and (3) those who are guilty of acts contrary to the principles of the United Nations. Article 1F of the U.N. Convention at 19 U.S.T. 6263-64. Thus, these groups are not eligible for refugee status under the U.N. Convention or the Protocol. The language in section 101(a)(42)(A) of the Act does not contain this exclusion. Second, in a provision that does not pertain to grants of asylum, Congress provided that a person may qualify as a refugee even if he is still inside his country of nationality or of habitual residence so long as he has been specially designated by the President. Section 101(a)(42)(B) of the Act. Neither the Protocol nor the U.N. Convention definition of "refugee" reaches persons still within the borders of their own countries. Martin, *The Refugee Act of 1980: Its Past and Future,* Transnat'l Legal Probs. of Refugees: 1982 Mich. Y.B. Int'l Legal Stud. 91, 101-03 (1982).

7 Specifically, former section 203(a)(7) allowed 17,400 persons each year to be conditionally admitted to the United States if they could demonstrate that (1) they had fled from a communist or communist-dominated country or from any country in the Middle East, and (2) they had fled these countries because of persecution or fear of persecution. *See* former section 203(a)(7) of the Act.

*of Adamska,* 12 I&N Dec. 201 (R.C. 1967). Immigration judges and the Board were without authority to decide applications brought under former section 203(a)(7), and accordingly the meaning of the phrase "fear of persecution" was never directly at issue, or construed, in proceedings before the Board. *See Matter of Guiragossian,* 17 I&N Dec. 161, 163 (BIA 1979).

"Fear" is a subjective condition, an emotion characterized by the anticipation or awareness of danger. *Webster's Third New International Dictionary* 831 (16th ed. 1971). The Office of the United Nations High Commissioner for Refugees ("UNHCR") has suggested in the *Handbook* that the definition of a refugee found in the Protocol requires fear to be a person's primary motivation for seeking refugee status. *See Handbook, supra,* at 11–12. While we do not consider the UNHCR's position in the *Handbook* to be controlling,[8] the *Handbook* nevertheless is a useful tool to the extent that it provides us with one internationally recognized interpretation of the Protocol.

Given the prominence of the word "fear" in the definition of a refugee created by Congress, and given the *Handbook's* persuasive assessment in this instance that "fear" should be a refugee's primary motivation, we conclude that an alien seeking to qualify under section 101(a)(42)(A) of the Act must demonstrate that his primary motivation for requesting refuge in the United States is "fear," *i.e.,* a genuine apprehension or awareness of danger in another country. No other motivation, such as dissent or disagreement with the conditions in another country or a desire to experience greater economic advantage or personal freedom in the

---

[8] The *Handbook* was issued in September 1979, whereas hearings on the Refugee Act were held in March and May 1979, and the Senate Judiciary Committee issued its report in July 1979. Thus, it is highly unlikely that Congress consulted the *Handbook* while drafting the definition of a refugee in the Refugee Act of 1980. *But see United States Refugee Program, Oversight Hearings before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary,* 97th Cong., 1st Sess. 24, 26 (1981) (memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, to David W. Crosland, General Counsel, Immigration and Naturalization Service) (assuming Congress was aware of the criteria articulated in the *Handbook* at the time of passage of the Refugee Act in 1980, but nonetheless concluding the *Handbook* is only a guideline).

In addition, the jurisdiction of the UNHCR has been expanded over the years and now encompasses large groups of persons displaced by civil strife or natural disasters who simply do not qualify under the Protocol's limited definition of a "refugee." Special Project, *Displaced Persons: "The New Refugees,"* 13 Ga. J. Int'l and Comp. Law 755, 763–71 (1983) and authorities cited therein. Thus, it cannot be certain to what extent the position in the *Handbook* reflects concepts that are outside the strict definition of a "refugee" under the Protocol. *See infra* p. 228.

United States, satisfies the definition of a refugee created in the Act.

Prior to 1980, "persecution" was construed to mean either a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive. *See, e.g., Kovac v. INS,* 407 F.2d 102, 107 (9th Cir. 1969); *Matter of Maccaud,* 14 I&N Dec. 429, 434 (BIA 1973); *Matter of Dunar, supra,* at 320; *Matter of Diaz,* 10 I&N Dec. 199, 200 n.1 (BIA 1963); *see also Matter of Laipenieks,* 18 I&N Dec. 433, 456-57 (BIA 1983).[9] The harm or suffering inflicted could consist of confinement or torture. *See Blazina v. Bouchard,* 286 F.2d 507, 511 (3d Cir. 1961). It also could consist of economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom. *See, e.g., Dunat v. Hurney,* 297 F.2d 744, 746 (3d Cir. 1961); *Matter of Salama,* 11 I&N Dec. 536 (BIA 1966); *Matter of Eusaph,* 10 I&N Dec. 453, 454 (BIA 1964). Generally harsh conditions shared by many other persons did not amount to persecution. *See Cheng Kai Fu v. INS,* 386 F.2d 750, 753 (2d Cir. 1967), *cert. denied,* 390 U.S. 1003 (1968). Prosecution for violating travel restrictions and laws of general applicability did not constitute persecution, unless the punishment was imposed for invidious reasons. *See Soric v. INS,* 346 F.2d 360, 361 (7th Cir. 1965); *Matter of Janus and Janek,* 12 I&N Dec. 866, 876 (BIA 1968).

Two significant aspects of this accepted construction of the term "persecution" were as follows. First, harm or suffering had to be inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor sought to overcome. *See, e.g., Matter of Diaz, supra,* at 204. Thus, physical injury arising out of civil strife or anarchy in a country did not constitute persecution. *Id.* at 203. Second, harm or suffering had to be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control. *See, e.g., McMullen v. INS, supra,* at 1315 n.2; *Rosa v. INS,* 440 F.2d 100, 102 (1st Cir. 1971); *Matter of McMullen,* 17 I&N Dec. 542, 544-45 (BIA 1980); *Matter of Pierre,* 15 I&N Dec. 461, 462 (BIA 1975).

We conclude that the pre-Refugee Act construction of "persecution" should be applied to the term as it appears in section 101(a)(42)(A) of the Act. It is a basic rule of statutory construction that words used in an original act or section, that are repeated in

---

[9] The word "persecution" appeared not only in former section 203(a)(7) but also in the predecessors to the present withholding of deportation provision in section 243(h) of the Act and in the regulatory provisions pertaining to grants of asylum. *See INS v. Stevic, supra,* at 414 and nn.6-7; 8 C.F.R. § 108 (1980). Prior to 1980, it was construed by us and by the courts primarily in the latter two contexts.

subsequent legislation with a similar purpose, are presumed to be used in the same sense in the subsequent legislation. *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also* 1A C. Sands, *Sutherland Statutory Construction* § 22.33 (4th ed. 1972). Thus, we presume that Congress, in using the term "persecution" in the definition of a refugee under section 101(a)(42)(A) of the Act, intended to adopt the judicial and administrative construction of that term existing prior to the Refugee Act of 1980. *See Commissioner v. Noel's Estate*, 380 U.S. 678, 681 (1965); *cf. McMullen v. INS, supra*, at 544–45. Our presumption is reinforced by the fact that in 1978, 2 years before enacting the Refugee Act of 1980, Congress chose not to define the word "persecution" when using it in other provisions of the Act because the meaning of the word was understood to be well established by administrative and court precedents. *See Matter of Laipenieks, supra*, at 456.

As was the case prior to enactment of the Refugee Act, "persecution" as used in section 101(a)(42)(A) clearly contemplates that harm or suffering must be inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome. The word does not embrace harm arising out of civil strife or anarchy. In fact, Congress specifically rejected a definition of a refugee that would have included "displaced persons," *i.e.*, those who flee harm generated by military or civil disturbances.[10] This construction is consistent with the international interpretation of "refugee" under the Protocol, for that term does not include persons who are displaced by civil or military strife in their countries of origin. *See* Special Project, *supra* note 8, at 763–69, and authorities cited therein.

In the case before us, we find that the respondent has adequately established that his primary motivation for seeking asylum is fear of persecution. We must now consider whether it has been demonstrated that this fear is well founded and whether the other elements necessary to establish eligibility for asylum have been satisfied.

---

[10] The Senate bill contained a definition of "refugee" that included "displaced persons" and referred, in part, to "any person who has been displaced by military or civil disturbance or uprooted because of arbitrary detention" who is unable to return to "his usual place of abode." *See* S. 643, 96th Cong., 1st Sess. § 201(a) (1979); S. Rep. No. 256, *supra*, at 4. The House bill did not contain such a provision. *See* H.R. 2816, 96th Cong., 1st Sess. § 201(a) (1979). The conference committee adopted the House version, thereby rejecting a definition of "refugee" that included "displaced persons." *See* H.R. Rep. No. 781, *supra*, at 19; *see also* section 101(a)(42)(A) of the Act.

*(2) The fear of persecution must be "well founded."*

In 1973, in *Matter of Dunar, supra,* we construed the meaning of "well-founded fear of persecution," as that phrase is used in the Protocol, as follows:

> [T]he requirement that the fear be "well-founded" rules out an apprehension which is purely subjective. . . . Some sort of showing must be made and this can ordinarily be done only by objective evidence. The claimant's own testimony as to the facts will sometimes be all that is available; *but the crucial question is whether the testimony, if accepted as true, makes out a realistic likelihood that he will be persecuted.*

*Matter of Dunar, supra,* at 319 (emphasis added). Our construction of the Protocol's well-founded fear standard was accepted by the courts and thereafter "a well-founded fear" of persecution was understood to mean that an alien had to produce objective evidence showing a likelihood or probability of persecution. *See INS v. Stevic, supra,* at 419-20 and n.12 and cases cited therein; *Kashani v. INS, supra,* at 379. Thus, during 1979 and 1980, the years in which Congress drafted, considered, and enacted the definition of "refugee" in section 101(a)(42)(A) of the Act, the accepted administrative and judicial construction in this country of the well-founded fear standard was one that linked this standard to objective facts, as opposed to purely subjective fear, and to the likelihood of persecution. *See INS v. Stevic, supra,* at 419-20 and n.12.

Congress did not indicate in the legislative history of the Refugee Act of 1980 that it intended to alter the accepted construction of "a well-founded fear of persecution" by using this phrase in the definition of a "refugee" in section 101(a)(42)(A) of the Act. Moreover, the pre-Refugee Act construction of "a well-founded fear of persecution" is nearly identical to that proposed by the authority on international refugee law, Atle Grahl-Madsen, in his treatise on the meaning of the U.N. Convention and the Protocol:

> The adjective 'well-founded' suggests that it is not the frame of mind of the person concerned which is decisive for his claim to refugeehood, but that this claim should be measured with a more objective yardstick.

> . . . .

> We cannot find a meaningful denominator in the minds of refugees. We must seek it in the conditions prevailing in the country whence they have fled.

> *'Well-founded fear of being persecuted'* may therefore be said to exist, if it is likely that the person concerned will become the victim of persecution if he returns to his country of origin.

> . . . .

> [T]he real test is the assessment of the likelihood of the applicant's becoming a victim of persecution upon his return to his country of origin. If there is a real

*chance that he will suffer persecution, that is reason good enough, and his 'fear' is 'well-founded'.*

1 A. Grahl-Madsen, *The Status of Refugees in International Law* §§ 76, 77, at 173, 175, 181 (1966) (emphasis added) (footnote omitted).

Lastly, the pre-Refugee Act construction of "a well-founded fear of persecution" is consistent with the intention of the drafters of the U.N. Convention, for by the use of this language the drafters were seeking to introduce an objective, as opposed to a purely subjective, test for the determination of refugee status. 1 A. Grahl-Madsen, *supra*, § 78, at 179.[11]

Since there is no indication that Congress intended to depart from the accepted judicial and administrative construction of "a well-founded fear of persecution" and since this construction is consistent with the U.N. Convention and the Protocol, we see no valid reason for departing from the construction of the well-founded fear standard that prevailed in this country prior to the Refugee Act of 1980. Accordingly, we continue to construe "a well-founded fear of persecution" to mean that an individual's fear of persecution must have its basis in external, or objective, facts that show there is a realistic likelihood he will be persecuted upon his return to a particular country.

As has always been the case, our construction of the well-founded fear standard reflects two fundamental concepts. The first is that in order to be "well founded," an alien's fear of persecution cannot be purely subjective or conjectural—it must have a solid

---

[11] The committee that drafted the phrase, "a well-founded fear of persecution," in the U.N. Convention defined the phrase to mean that a person actually must have been a victim of persecution or be able to show "good reason" why he fears persecution. *Matter of Dunar, supra,* at 319. That committee considered various proposals defining refugee status in terms of being unwilling to return to one's country of origin because of "serious apprehension based on reasonable grounds of . . . persecution," or a "justifiable fear of persecution," or a "fear of persecution," before selecting the term "well-founded" to describe the nature of the fear that qualified one as a refugee. U.N. Docs, E/AC.32/L.2, E/AC.32/L.3, E/AC.32/L.4 and Add. 1 (Jan. 17, 1950). In addition, the committee was guided by prior international agreements pertaining to refugees, one of which was the Constitution of the International Refugee Organization ("IRO"). *See* Report of the Ad Hoc Committee on Statelessness and Related Problems, U.N. Doc. E/1618 at 37 (Feb. 17, 1950). The IRO Constitution provided that refugees and displaced persons became the concern of the IRO if, inter alia, they had valid objections to returning to their countries of origin such as "persecution or fear, based on reasonable grounds of persecution." Constitution of the IRO, *ratified* Dec. 16, 1946, Part I, §§ A, B, C.1(a)(1), 62 Stat. 3037, T.I.A.S. No. 1846, 18 U.N.T.S. 3 (effective Aug. 30, 1948). *reprinted in* 1948 U.S. Code Cong. Service 2042, 2051-52. Thus, we conclude that in using the phrase "well-founded fear of persecution," the drafters of the U.N. Convention were attempting to create an objective measure of the fear of persecution.

basis in objective facts or events. *Compare Matter of Martinez-Romero*, 18 I&N Dec. 75, 79 (BIA 1981) (an alien did not show a well-founded fear of persecution because there were no objective facts supporting his claim to asylum) *with Matter of Dunar, supra*, at 319 (a showing of a well-founded fear of persecution rules out a purely subjective apprehension and requires a showing to be made by objective evidence). This concept, after all, is consistent with the generally understood meaning of the term "well-founded," which refers to something that has a firm foundation in fact or is based on excellent reasoning, information, judgment, or grounds. *See Webster's Third New International Dictionary, supra*, at 2595.

The second fundamental concept that is, and always has been, reflected in our construction of "a well-founded fear of persecution" is that in order to warrant the protection afforded by a grant of refuge, an alien must show it is likely he will become the victim of persecution. *Compare Matter of Salim, supra*, at 313–15 (an alien established eligibility for asylum and met the well-founded fear standard because he showed the requisite "likelihood" of persecution) *with Matter of Dunar, supra*, at 319 (the crucial question under the well-founded fear standard is whether a person has shown a realistic "likelihood" of persecution). Since language by its nature is inexact, we have used such words as "likelihood," or "realistic likelihood," or even "probability" of persecution to express this concept. *See, e.g., Matter of Salim, supra; Matter of Dunar, supra*. By use of such words we do not mean that "a well-founded fear of persecution" requires an alien to establish to a particular degree of certainty, such as a "probability" as opposed to a "possibility," that he will become a victim of persecution. Rather, as a practical matter, what we mean can best be described as follows: the evidence must demonstrate that (1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware, or could easily become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien. The first of these factors is inherent in the showing that the conduct the alien fears amounts to "persecution" under the Act, *i.e.*, the infliction of suffering or harm in order to punish an alien because he differs in a way a persecutor deems offensive and seeks to overcome. The second, third, and fourth factors are all indispensable in showing that there is a real chance an alien will become a victim of persecution, for if the persecutor is not aware or could not easily become aware that an alien possesses the characteristic that is the basis for persecution, or if the persecutor lacks the capa-

bility to carry out persecution, or if the persecutor has no inclination to punish the particular alien, then it cannot reasonably be found that the alien is likely to become the persecutor's victim. The issue of whether an alien's facts demonstrate these four factors is one that ordinarily must be decided on a case-by-case basis, for the question of what kinds of facts show a likelihood of persecution ultimately depends upon each alien's own particular situation. "[T]he likelihood of becoming a victim of persecution may vary from person to person. For example, a well-known personality may be more exposed to persecution than a person who has always remained obscure. . . . [T]herefore [it may be] necessary to assess the situation of each person on its own merits." 1 A. Grahl-Madsen, *supra,* § 76, at 175.

To date, the courts have not agreed upon a common description of the well-founded fear standard in section 101(a)(42)(A) of the Act. The Third Circuit has essentially adopted our language and concluded that "a realistic likelihood" of persecution accurately describes the well-founded fear standard. *Compare Rejaie v. INS, supra,* at 146 *with Matter of Dunar, supra,* at 319. The Sixth, Seventh, and Ninth Circuits, on the other hand, appear to have chosen the language "good reason" or "valid reason" to fear persecution to describe this standard. *Bolanos-Hernandez v. INS, supra,* at 1322; *Youkhanna v. INS, supra,* at 362; *Carvajal-Munoz v. INS, supra,* at 574, 576-77; *see also Stevic v. Sava,* 678 F.2d 401, 405-06 (2d Cir. 1982), *rev'd on other grounds, INS v. Stevic, supra.* We think that on their face descriptions such as "good reason" or "valid reason" to fear persecution do not adequately describe the well-founded fear standard. To the extent that such words could be interpreted to mean that an alien's fear of persecution need only be plausible,: they do not reflect the generally understood meaning of "well-founded." *See supra* p. 226. Nor do these words reflect the understanding of Congress, and the meaning of the Protocol, that an alien must show it is likely he will become a victim of persecution before he is eligible for refuge. *See supra* pp. 224-25.

Moreover, as a practical matter, we are not certain that these descriptions most accurately describe the analysis used by the courts when ascertaining whether an alien's fear of persecution is "well founded." No matter how the courts have described the well-founded fear standard, they have required an alien to come forward with more than his purely subjective fears of persecution; he has been required to show that his fears have a sound basis in personal experience or in other external facts or events. *See, e.g., Bolanos-Hernandez v. INS, supra,* at 1321 and n.11; *Youkhanna v. INS, supra,* at 362; *Carvajal-Munoz, supra,* at 574, 576-77; *Rejaie v. INS, supra,*

227

at 145-46. In addition, each of the courts has assessed an alien's facts to determine whether he is likely to become a victim of persecution and, in so doing, has looked for facts demonstrating some combination of the four factors we have used to describe a likelihood of persecution. *See, e.g., Bolanos-Hernandez v. INS, supra,* at 1324; *Dally v. INS,* 744 F.2d 1191, 1196 (6th Cir. 1984); *Carvajal-Munoz v. INS, supra,* at 577-79; *Chavez v. INS,* 723 F.2d 1431, 1433-34 (9th Cir. 1984); *Shoaee v. INS,* 704 F.2d 1079, 1083-84 (9th Cir. 1983).

Our construction of "a well-founded fear of persecution" is also consistent with some aspects of the UNHCR's interpretation of the Protocol. Like us, the UNHCR is of the opinion that the term "well-founded" requires a person's fear of persecution to be more than a matter of personal conjecture and to be supported by an objective situation. *Handbook, supra,* para. 38, 41, at 11-13. Furthermore, the UNHCR is of the opinion that a person claiming a well-founded fear of persecution must show that he is not tolerated by, and has come to the attention of, a persecutor. *Handbook, supra,* para. 80, at 19. However, we are not certain that the UNHCR's position adequately reflects the concept, inherent both in the Protocol and in the construction of the well-founded fear standard at the time Congress employed it in section 101(a)(42)(A) of the Act, that refuge in this country should be dependent upon a showing of a likelihood of persecution. For example, the UNHCR advocates that a well-founded fear of persecution is established merely if an alien finds his return to a country to be "intolerable" or wishes to avoid situations entailing some risk of persecution. *Handbook, supra,* para. 42, 45, at 12-13. Therefore, to the extent that the UNHCR's position in the *Handbook* does not require an individual to show he is likely to become a victim of persecution, we find that position to be inconsistent with Congress' intention and with the meaning of the Protocol.

Given our construction of the showing required by the language "a well-founded fear of persecution," it remains to be determined how this showing compares with the "clear probability" of persecution required for section 243(h) withholding of deportation. The Third and Seventh Circuits view the well-founded fear and clear probability standards to be either identical or very similar to one another. *Sotto v. INS, supra,* at 836; *Carvajal-Munoz, supra,* at 574-75. The Ninth Circuit, on the other hand, has concluded that the well-founded fear standard is more generous to an alien than the clear probability standard. *Bolanos-Hernandez v. INS, supra,* at 1321; *see also Stevic v. Sava, supra,* at 406.

One might conclude that "a well-founded fear of persecution," which requires a showing that persecution is likely to occur, refers to a standard that is different from "a clear probability of persecution," which requires a showing that persecution is "more likely than not" to occur. As a practical matter, however, the facts in asylum and withholding cases do not produce clear-cut instances in which such fine distinctions can be meaningfully made. Our inquiry in these cases, after all, is not quantitative, i.e., we do not examine a variety of statistics to discern to some theoretical degree the likelihood of persecution. Rather our inquiry is qualitative: we examine the alien's experiences and other external events to determine if they are of a kind that enable us to conclude the alien is likely to become the victim of persecution. In this context, we find no meaningful distinction between a standard requiring a showing that persecution is likely to occur and a standard requiring a showing that persecution is more likely than not to occur. As we construe them, both the well-founded fear standard for asylum and the clear probability standard for withholding of deportation require an alien's facts to show that the alien possesses a characteristic a persecutor seeks to overcome by punishing the individuals who possess it, that a persecutor is aware or could easily become aware the alien possesses this characteristic, that a persecutor has the capability of punishing the alien, and that a persecutor has the inclination to punish the alien. Accordingly, we conclude that the standards for asylum and withholding of deportation are not meaningfully different and, in practical application, converge.

Our position is most consistent with what we perceive to have been Congress' understanding of the relationship between asylum and withholding of deportation at the time the present provisions were enacted in the Refugee Act of 1980. Prior to 1980, asylum and withholding of deportation were closely related forms of relief, and asylum was available if an alien could show the same likelihood of persecution that was required for withholding of deportation.[12]

---

[12] Prior to the Refugee Act of 1980, a request for asylum filed after completion of deportation proceedings was considered to be a request for section 243(h) withholding of deportation and for, inter alia, the benefits of Article 33 of the Protocol and the U.N. Convention which prohibit the expulsion of a refugee to a place where his "life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." INS v. Stevic, supra, at 416–17, 420 n.13; see also 8 C.F.R. § 108.3(a) (1980). An applicant for asylum had the burden of proving that he "would be subject to persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 108.3(c) (1980).

*Continued*

The legislative history of the Refugee Act does not contain any express indication that Congress intended to alter this relationship; quite the contrary, the legislative history indicates that Congress understood it was preserving this relationship.[13]

Thus, under the changes made by the Refugee Act of 1980, an alien is eligible for asylum if he meets all of the other elements in the definition of a refugee under section 101(a)(42)(A) of the Act and can show "a well-founded fear of persecution," i.e., objective facts that demonstrate it is likely he will become a victim of persecution. Section 208(a) of the Act. A grant of asylum provides him not only with temporary refuge in this country, but with the possibility of obtaining permanent refuge here, i.e., an opportunity to become a lawful permanent resident. Section 209(b) of the Act. However, asylum is ultimately a matter of discretion. Section 208(a) of the Act. An alien may be denied asylum as a matter of discretion, may be found deportable or excludable, and then may find himself in the position of being expelled. In such a situation he is nonetheless protected against expulsion to the country of persecution, so long as he qualifies for withholding of deportation. See section 243(h)(1) and (2) of the Act. However, withholding of deportation only protects the alien from being expelled to the country in which his life or freedom would be threatened, it does not prevent

---

Similarly, withholding of deportation under section 243(h) of the Act was construed to be comparable to the benefit afforded by Article 33 of the Protocol and the U.N. Convention. See Matter of Dunar, supra, at 319-20. An alien seeking withholding of deportation, like an alien seeking asylum, was required to show he "would be subject to persecution on account of race, religion, or political opinion." 8 C.F.R. § 242.17(c) (1980); see also INS v. Stevic, supra, at 414 nn.6 & 7, 420 n.13.

[13] The Senate bill required that in order to be eligible for asylum an alien must meet the well-founded fear definition of a refugee and must show that his deportation or return was prohibited by the section 243(h) withholding of deportation provision. S. 643, supra, § 203(e); S. Rep. No. 256, supra, at 16. The Senate assumed that this did not change the then-existing substantive standard for asylum. S. Rep. No. 256, supra, at 9. The House bill contained an asylum provision that made no express reference to withholding of deportation. See H.R. 2816, supra, § 203(e). However, the House Judiciary Committee perceived asylum and withholding of deportation to be related forms of relief accomplishing the same end, namely that of conforming United States law to the obligation of Article 33 of the Protocol and the U.N. Convention. H.R. Rep. No. 608, supra, at 17-18. The conference committee adopted the House version of the asylum provision and thus in the language of the statute did not link asylum to withholding of deportation. See H.R. Rep. No. 781, supra, at 5. Nevertheless, in its report the committee perceived asylum and withholding of deportation to be interchangeable and did not distinguish them as separate forms of relief. Id. at 20. We think these facts show that Congress understood the functions of asylum and withholding of deportation to be closely related and the standards of eligibility for these forms of relief to be essentially comparable. But see Carvajal-Munoz v. INS, supra, at 574-75 n.15.

his expulsion to some other country. *Compare* sections 243(a) and (h) of the Act.

We note that the Seventh Circuit has viewed this statutory structure as lending support for the conclusion that the standards for withholding of deportation and asylum are somewhat different from one another, for the court has concluded that Congress reasonably could have intended an entitlement to withholding of deportation to be available upon a greater showing than that required for a discretionary grant of asylum. *Carvajal-Munoz, supra,* at 575. Conversely, however, the structure of the Act also lends support for the conclusion that Congress intended withholding of deportation to be available upon a lesser showing than that required for asylum, because the right to avoid deportation to one particular country, which is afforded by withholding of deportation, is a lesser benefit than the privileges of remaining in this country under a grant of refuge and of becoming a permanent resident, which are afforded by asylum. Since the structure of the Act reasonably supports two contrary conclusions about the relationship between the standards for asylum and withholding of deportation, we do not find the Act's structure to be particularly helpful in ascertaining Congress' understanding or intention. Rather, we find a better indication of Congress' intention in the legislative history showing that Congress perceived the standards for asylum and withholding of deportation to be comparable to one another.

In the case before us, the respondent claims he fears persecution at the hands of two groups: the government and the guerrillas. Therefore, under our construction of the well-founded fear standard, the respondent must show that his fear of persecution by these groups is more than a matter of personal conjecture or speculation; he must show by objective events that his fear has a sound basis in fact and that persecution by the government or by the guerrillas is likely to occur if he is returned to El Salvador. This means that he must demonstrate that (1) he possesses characteristics the government or the guerrillas seek to overcome by means of punishment of some sort; (2) the government or the guerrillas are aware or could easily become aware that he possesses these characteristics; (3) the government or the guerrillas have the capability of punishing him; and (4) the government and the guerrillas have the inclination to punish him.

The respondent's fear of persecution by the government has no basis whatsoever in either his personal experiences or in other external events. To the contrary, by the respondent's own admission, this fear is based solely on his impression that some officials in the government may have viewed COTAXI as being too socialistic. This

purely subjective impression is not sufficient to show a well-founded fear of persecution by the government.

In addition, whatever the facts may have been prior to the respondent's departure from El Salvador, those facts have changed significantly since 1981. Most importantly, the respondent admitted that he does not intend to work as a taxi driver upon his return to El Salvador. The respondent's facts do not show that the persecution of taxi drivers continued even after they stopped working as drivers. Furthermore, the respondent testified that the guerrillas' strength has diminished significantly in El Salvador since 1981. For these reasons, the respondent has not shown that at the present time he possesses characteristics the guerrillas seek to overcome or that the guerrillas have the inclination to punish him. Thus, the facts do not demonstrate that there is a likelihood the respondent would be persecuted by the guerrillas should he be returned to El Salvador, and accordingly his fear of persecution upon deportation has not been shown to be "well founded."

(3) *The persecution feared must be "on account of race, religion, nationality, membership in a particular social group, or political opinion."*

The respondent has argued that the persecution he fears at the hands of the guerrillas is on account of his membership in a particular social group comprised of COTAXI drivers and persons engaged in the transportation industry of El Salvador and is also on account of his political opinion.

The requirement of persecution on account of "membership in a particular social group" comes directly from the Protocol and the U.N. Convention. *See supra* p. 219. Congress did not indicate what it understood this ground of persecution to mean, nor is its meaning clear in the Protocol. This ground was not included in the definition of a refugee proposed by the committee that drafted the U.N. Convention; rather it was added as an afterthought. 1 A. Grahl-Madsen, *supra,* at 219. International jurisprudence interpreting this ground of persecution is sparse. G. Goodwin-Gill, *The Refugee in International Law* 30 (1983). It has been suggested that the notion of a "social group" was considered to be of broader application than the combined notions of racial, ethnic, and religious groups and that in order to stop a possible gap in the coverage of the U.N. Convention, this ground was added to the definition of a refugee. 1 A. Grahl-Madsen, *supra,* at 219. A purely linguistic analysis of this ground of persecution suggests that it may encompass persecution seeking to punish either people in a certain relation, or

having a certain degree of similarity, to one another or people of like class or kindred interests, such as shared ethnic, cultural, or linguistic origins, education, family background, or perhaps economic activity. G. Goodwin-Gill, *supra*, at 31. The UNHCR has suggested that a "particular social group" connotes persons of similar background, habits, or social status and that a claim to fear persecution on this ground may frequently overlap with persecution on other grounds such as race, religion, or nationality. *Handbook, supra*, at 19.

We find the well-established doctrine of ejusdem generis, meaning literally, "of the same kind," to be most helpful in construing the phrase "membership in a particular social group." That doctrine holds that general words used in an enumeration with specific words should be construed in a manner consistent with the specific words. *See, e.g., Cleveland* v. *United States*, 329 U.S. 14 (1946); 2A C. Sands, *supra*, § 47.17. The other grounds of persecution in the Act and the Protocol listed in association with "membership in a particular social group" are persecution on account of "race," "religion," "nationality," and "political opinion." Each of these grounds describes persecution aimed at an immutable characteristic: a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed. *See* 1 A. Grahl-Madsen, *supra*, at 217; G. Goodwin-Gill, *supra*, at 31. Thus, the other four grounds of persecution enumerated in the Act and the Protocol restrict refugee status to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution.

Applying the doctrine of ejusdem generis, we interpret the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only when this is the case does the mere fact of group membership become something comparable to the other four grounds of persecution under the Act, namely, some-

thing that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed. By construing "persecution on account of membership in a particular social group" in this manner, we preserve the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution.

In the respondent's case, the facts demonstrate that the guerrillas sought to harm the members of COTAXI, along with members of other taxi cooperatives in the city of San Salvador, because they refused to participate in work stoppages in that city. The characteristics defining the group of which the respondent was a member and subjecting that group to punishment were being a taxi driver in San Salvador and refusing to participate in guerrilla-sponsored work stoppages. Neither of these characteristics is immutable because the members of the group could avoid the threats of the guerrillas either by changing jobs or by cooperating in work stoppages. It may be unfortunate that the respondent either would have had to change his means of earning a living or cooperate with the guerrillas in order to avoid their threats. However, the internationally accepted concept of a refugee simply does not guarantee an individual a right to work in the job of his choice. See 1 A. Grahl-Madsen, *supra*, at 214. Therefore, because the respondent's membership in the group of taxi drivers was something he had the power to change, so that he was able by his own actions to avoid the persecution of the guerrillas, he has not shown that the conduct he feared was "persecution on account of membership in a particular social group" within our construction of the Act.

Moreover, the respondent did not demonstrate that the persecution he fears is "on account of political opinion." The fact that the respondent was threatened by the guerrillas as part of a campaign to destabilize the government demonstrates that the guerrillas' actions were undertaken to further their political goals in the civil controversy in El Salvador. However, conduct undertaken to further the goals of one faction in a political controversy does not necessarily constitute persecution "on account of political opinion" so as to qualify an alien as a "refugee" within the meaning of the Act.

As we have previously discussed, the term "persecution" means the infliction of suffering or harm in order to punish an individual for possessing a particular belief or characteristic the persecutor seeks to overcome. It follows, therefore, that the requirement of "persecution on account of political opinion" means that the particular belief or characteristic a persecutor seeks to overcome in an individual must be his political opinion. Thus, the requirement of

"persecution on account of political opinion" refers not to the ultimate political end that may be served by persecution, but to the belief held by an individual that causes him to be the object of the persecution. *See* 1 A. Grahl-Madsen, *supra,* at 212, 220; G. Goodwin-Gill, *supra,* at 31. This construction is consistent with the other grounds of persecution enumerated in the Act such as "race," "religion," "nationality," and "membership in a particular social group," each of which specifies a characteristic an individual possesses that causes him to be subject to persecution. Moreover, this construction is consistent with Congress' intention that not all harm with political implications, such as that which arises out of civil strife in a country, qualifies an alien as a "refugee." *See* discussion *supra* p. 223 & note 10.

In the respondent's case there are no facts showing that the guerrillas were aware of or sought to punish the respondent for his political opinion; nor was there any showing that the respondent's refusal to participate in the work stoppages was motivated by his political opinion. Absent such a showing, the respondent failed to demonstrate that the particular belief the guerrillas sought to overcome in him was his political opinion. Therefore he does not come within this ground of persecution.

(4) *The alien must be unable or unwilling to return to his country of nationality or to the country in which he last habitually resided because of persecution or his well-founded fear of persecution.*

Traditionally, a refugee has been an individual in whose case the bonds of trust, loyalty, protection, and assistance existing between a citizen and his country have been broken and have been replaced by the relation of an oppressor to a victim. *See* 1 A. Grahl-Madsen, *supra,* at 97, 100. Thus, inherent in refugee status is the concept that an individual requires international protection because his country of origin or of habitual residence is no longer safe for him. *Id.* We consider this concept to be expressed, in part, by the requirement in the Act and the Protocol that a refugee must be unable or unwilling to return to a particular "country." *See* section 101(a)(42)(A) of the Act. We construe this requirement to mean that an alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country—he must show that the threat of persecution exists for him country-wide.

In the respondent's case, the facts show that taxi drivers in the city of San Salvador were threatened with persecution by the leftist guerrillas. However, the facts do not show that this threat exist-

ed in other cities in El Salvador. It may be the respondent could have avoided persecution by moving to another city in that country.[14] In any event, the respondent's facts did not demonstrate that the guerrillas' persecution of taxi drivers occurred throughout the country of El Salvador. Accordingly, the respondent did not meet this element of the standard for asylum.

In summary, the respondent's facts fail to show that (1) his present fear of persecution by the government and the guerrillas is "well founded"; (2) the persecution he fears is on account of one of the five grounds specified in the Act; and (3) he is unable to return to the country of El Salvador, as opposed to a particular place in that country, because of persecution. Thus, he has not met three of the four elements in the statutory definition of a refugee created by section 101(a)(42)(A) of the Act. Accordingly, the respondent has not shown he is eligible for a grant of asylum.

## THE STATUTORY STANDARD FOR WITHHOLDING OF DEPORTATION

Section 243(h) of the Act, which specifies the standard of eligibility for withholding of deportation, requires an alien to show a clear probability of persecution, *i.e.*, that it is more likely than not he will be the victim of persecution, in a particular country. *INS* v. *Stevic, supra*, at 425. As we indicated, *supra* p. 229, the showing of the likelihood of persecution contemplated by this standard converges, in practice, with the showing required by the well-founded fear standard for asylum. Therefore, since the respondent has not demonstrated a sufficient likelihood of persecution at the hands of either the government or the guerrillas to make his fear "well-founded," it follows that the respondent has not demonstrated the "clear probability" of persecution needed for withholding of deportation. Moreover, since the conduct the respondent fears has not been shown to be inflicted on account of "membership in a particular social group" or "political opinion" within our construction of the Act, the respondent has also failed to show that he comes within one of the five grounds of persecution specified in section 243(h). Accordingly, the respondent has not met the standard of eligibility for withholding of deportation.

---

[14] It is unfortunate when persons may be obliged to give up their jobs and leave their homes as a result of fear. But that is not the issue here. The issue is, once that decision is made, does an individual have the right to come to the United States rather than to move elsewhere in his home country.

236

For the foregoing reasons the respondent has not shown he is eligible either for asylum or withholding of deportation to El Salvador. Therefore, we shall dismiss his appeal.

**ORDER:** The appeal is dismissed.