FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARIELA JOVANNI PLANCARTE SAUCEDA; JOSMAR JOSE PLANCARTE SAUCEDA,<br><br>              *Petitioners*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General,<br><br>              *Respondent.* | No. 19-73312<br><br>Agency Nos.<br>A202-097-301<br>A202-097-302<br><br><br>ORDER AND<br>AMENDED<br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 10, 2021
Seattle, Washington

Filed August 20, 2021
Amended January 14, 2022

Before: William A. Fletcher, Paul J. Watford, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Immigration

The panel filed (1) an order amending the opinion filed August 20, 2021, denying the government's petition for panel rehearing, and ordering that no further petitions for panel rehearing or rehearing en banc would be entertained; and (2) an amended opinion granting Mariela Plancarte Sauceda's petition for review of a decision of the Board of Immigration Appeals affirming the denial of her application for asylum and related relief, and remanding. In the amended opinion, the panel held that the Board's rejection of Plancarte's proposed particular social group of "female nurses" on the ground that "nursing" is not an immutable characteristic was unreasonable, and that substantial evidence did not support the Board's finding of no governmental involvement or acquiescence in Plancarte's forced provision of medical services to cartel members.

The panel first concluded that venue under 8 U.S.C. § 1252(b)(2) was proper in the Ninth Circuit where: (1) the immigration judge in this case formally transferred venue from Salt Lake City to Boise; (2) thereafter Plancarte never physically appeared in Salt Lake City, but rather remained in Boise; (3) the IJ indicated that proceedings were conducted in Boise, and the Board held that proper venue was in the Ninth Circuit; (4) both final hearing notices designated Boise as the location for the final hearing; and (5) the statute expressly allows any of the participants in a removal hearing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to appear at the designated hearing location by "video conference," pursuant to 8 U.S.C. § 1129a(b)(2)(A)(iii), and the IJ and the government attorney elected to do so from Salt Lake City.

Citing *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), the Board concluded that "female nurses" were not a cognizable "particular social group" because being a nurse, like being a taxi driver, is not an immutable characteristic. The panel held that the Board erred by simply citing *Matter of Acosta*, and failing to provide any meaningful analysis about the immutability of "female nurses." The panel explained that in contrast to *Acosta*, Plancarte cannot avoid compulsion by the cartel simply by changing jobs, because even if she ceased *employment* as a nurse, she would still *be* a nurse, as she has received specialized medical training and has a professional license as a nurse.

The panel observed that the IJ and the Board found Plancarte's removal hearing testimony credible, and that the government made no argument contrary to that finding, nor any argument that Plancarte's testimony and other evidence failed to persuasively establish the truth of her narrative as it relates to the issues concerning her asylum and withholding claims. The panel explained that although credibility alone is not dispositive of both persuasiveness and legal sufficiency, because there was no testimony or other evidence inconsistent with Plancarte's recounting of her experiences, and there was no reason to doubt the truth, or persuasiveness of her narrative, the panel would accept as true Plancarte's narrative based on her oral and written testimony.

The panel wrote that the cartel targeted Plancarte precisely because of her specialized nursing skills, and

threatened her and her family with torture and death to force her to use those skills to provide medical treatment to the cartel. Thus, regardless of whether she would continue to work as a licensed nurse, the panel wrote that Plancarte lacks "the power to change" the immutable nursing characteristics—her medical knowledge and nursing skills—that make her important to the cartel. The panel therefore granted the petition with respect to Plancarte's asylum and withholding of removal claims, and remanded for consideration of the other required characteristics of her proposed particular social group of "female nurses."

Turning to Plancarte's CAT claim, the panel concluded that the Board's decision ignored uncontradicted record evidence showing both acquiescence and direct involvement by government officials. The panel held that substantial evidence therefore compelled the conclusion that there was official involvement and acquiescence in Plancarte's forced provision of medical treatment to cartel members. The panel granted the petition with respect to CAT, and remanded for a determination whether the likelihood of torture if Plancarte were returned to Mexico is sufficient to warrant CAT relief.

**COUNSEL**

Vallerye Anderson (argued), Garcia & Anderson, Sacramento, California, for Petitioners.

Timothy Bo Stanton (argued), Trial Attorney; W. Manning Evans, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Brian M. Boynton, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**ORDER**

The Opinion, filed on August 20, 2021, and reported at 9 F.4th 1146 (9th Cir. 2021), is amended as follows.

At 9 F.4th at 1149, the first paragraph of Section I.A is deleted and replaced with:

> The IJ found Plancarte's removal hearing testimony credible, and the BIA left this finding undisturbed. Although credibility alone is not "dispositive of both persuasiveness and legal sufficiency," *Garland v. Dai*, 141 S. Ct. 1669, 1681 (2021), here there was no testimony or other evidence inconsistent with Plancarte's recounting of her experiences, and there was no reason to doubt the truth, or "persuasiveness," of her narrative, *id.* at 1680–81. *See infra* Section III.C. We therefore accept as true the

following narrative based on her oral and written testimony.

At 9 F.4th at 1153, after the first paragraph of Section III.B, a new paragraph is added:

The IJ and the BIA found Plancarte's removal hearing testimony credible. The government makes no argument contrary to that finding. Nor does the government argue that Plancarte's testimony and other evidence fail to persuasively establish the truth of her narrative as it relates to the issues before us concerning her asylum and withholding claims. *See Dai*, 141 S. Ct. at 1680–81.

In addition, the first sentence of the following paragraph of Section III.B now begins <Both asylum and withholding>, replacing <Both forms of relief>.

At 9 F.4th at 1155, after the second paragraph of Section III.C, a new paragraph is added:

The IJ and the BIA found Plancarte's removal hearing testimony credible. The government makes no argument contrary to that finding. However, the government argues that Plancarte's evidence of acquiescence or involvement by Mexican public officials, though credible, is nonetheless insufficient to carry her burden of proof as it relates to her CAT claim. *See Dai*, 141 S. Ct. at 1680–81.

In addition, in the penultimate paragraph of Section III.C, the sentence <Critically, the agency concluded that there was "no evidence" that "Mexican officials were involved" in Plancarte's "being pressed into service by a criminal organization as a nurse."> is amended so that it now reads <Critically, the agency concluded that there was "no evidence" that "Mexican public officials were involved" in Plancarte's "being pressed into service for a criminal organization as a nurse.">

At 9 F.4th at 1156, the final paragraph of Section III.C is deleted and replaced with:

> Here, the record does not "contain[] contrary evidence of a kind and quality that a reasonable factfinder could find sufficient." *Dai*, 141 S. Ct. at 1677 (citation and internal quotation marks omitted). We hold that, on this record, substantial evidence compels the conclusion that there was official involvement and acquiescence in the cartel forcing Plancarte to provide medical treatment to cartel members. *See id.* at 1679 (citing 8 U.S.C. § 1252(b)(4)(B)). We therefore grant Plancarte's petition with respect to CAT, and remand for a determination whether the likelihood of torture if she were returned to Mexico is sufficient to warrant CAT relief.

An Amended Opinion is filed concurrently with this Order.

With the Opinion as amended, the panel has voted unanimously to **DENY** Respondent's petition for panel

rehearing, filed September 29, 2021. No subsequent petitions for panel or en banc rehearing will be entertained.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Mariela Plancarte Sauceda and her minor son petition for review of a Board of Immigration ("BIA") order affirming the denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Plancarte, a licensed nurse, claims she was forced to provide medical services to drug cartel members, both at and outside of the hospital where she worked. Plancarte ultimately fled to the United States.

The BIA agreed with Plancarte that the Immigration Judge ("IJ") erred by not considering her proposed particular social group of "female nurses," but it deemed the error harmless after determining that her occupation did not qualify because in its view, being a nurse is not an immutable characteristic. The BIA did not reach the question whether the proposed social group is sufficiently particular and/or socially visible, and it failed to analyze whether Plancarte was persecuted on account of her membership in this group. The BIA also affirmed the IJ's denial of relief under CAT.

We first address venue and hold that the Ninth Circuit is the proper venue for this petition for review because Boise, Idaho, is the place "in which the immigration judge completed the proceedings." *See* 8 U.S.C. § 1252(b)(2). We next address the substance of Plancarte's petition and hold

that (1) the BIA's rejection of the proposed particular social group of "female nurses" on the ground that "nursing" is not an immutable characteristic was unreasonable, and (2) the BIA's CAT finding that there was no governmental involvement or acquiescence in the cartel's actions is not supported by substantial evidence.

We grant the petition and remand to the BIA.

## I. Background

### A. Plancarte's Evidence

The IJ found Plancarte's removal hearing testimony credible, and the BIA left this finding undisturbed. Although credibility alone is not "dispositive of both persuasiveness and legal sufficiency," *Garland v. Dai*, 141 S. Ct. 1669, 1681 (2021), here there was no testimony or other evidence inconsistent with Plancarte's recounting of her experiences, and there was no reason to doubt the truth, or "persuasiveness," of her narrative, *id.* at 1680–81. *See infra* Section III.C. We therefore accept as true the following narrative based on her oral and written testimony.

Plancarte is a licensed nurse from Arteaga, Michoacán, Mexico. She obtained the position after the Mayor of Arteaga recommended her to Dr. Tello, the director of the hospital. She wrote in her asylum application that the Mayor recommended her for the position "because I had treated cartel members before in silence and the Mayor wanted to keep me there to continue to work on cartel members."

Early in her employment at the hospital, Dr. Tello came to Plancarte's home. He was accompanied by cartel members

dressed in bulletproof vests and "belts with straps and knives." Dr. Tello told Plancarte they were going to "heal some people." Plancarte told the men she was off duty. One cartel member, known as "El Rojo," said, "[W]e are not asking if you want to go. You are going."

The men took Plancarte to an aviation field, blindfolded her, and tied her hands with rope. They changed vehicles at the field and took her to a cabin. Once there, the men took off Plancarte's blindfold and untied her hands. There were three people with bullet wounds in the cabin. Plancarte was told to treat them.

El Rojo then took Plancarte to another cabin. Inside, there were three injured people who appeared to have been kidnapped. She saw three men "gang raping a young woman." They also raped her with a "PVC pipe and tree branches." "They made me watch and told me this would happen to me if I disobeyed them. I saw that the woman was unconscious, bleeding out, and dying, and I could not do anything to save her so she died." El Rojo threatened Plancarte's family with violence and told Plancarte that the cartel knew where she lived, knew where her family lived, and knew everything about her.

Plancarte was later forced to care for cartel members and their family members at the hospital. The cartel members had private rooms, special guards, and no identifying paperwork. The police protected them by guarding the entrance to the hospital. Upon discharge, the police escorted the cartel members and their families out of the hospital.

On a later occasion, El Rojo and two other men came to Plancarte's home "in a hurry" and said, "[L]et's go."

Plancarte had her infant son in her arms. She told the men she needed to set down her son. One of the men "snatched" Plancarte's son from her arms and gave him to Plancarte's mother. Another man pointed his gun at her mother and her son, and said that he was not joking.

Plancarte was blindfolded, tied up, and taken to a house. Inside the house, Plancarte saw that two cartel members, El Rojo's brother and another man, were injured. Dr. Tello and three or four other people were also inside the house. At the insistence of the cartel members, Plancarte treated the wounded men. She was repeatedly threatened with violence if she said anything about what she was being forced to do. "[T]hey said to me that I was going to go through the same thing [as] the girl I had seen, of how they killed her, of how they tortured her. . . . They would say that they would have to kill my mom or my son[.]"

On a final occasion, Plancarte initially refused to go to an off-site location. Cartel members grabbed her and beat her until she bled, kidnapped her son, and forced her into a vehicle. Plancarte was taken to a house where there was a man who had been shot twice, in the stomach and the foot. Plancarte told the cartel members that she would do whatever they asked as long as she got her son back. After Plancarte treated the man, the cartel members took her back to her home at about 10:00 or 11:00 that night. Her son was there when she arrived.

After this last episode, Plancarte fled to the United States.

### B.  Procedural History

When Plancarte arrived in the United States, she immediately expressed her fears to immigration officials about returning to Mexico.  However, she did not file a formal application for asylum until more than a year after her entry into the United States.

In March 2018, the IJ issued a written decision denying Plancarte's applications for asylum, withholding of removal, and relief under CAT.  The IJ concluded that Plancarte's asylum application was untimely[1] and that she was therefore ineligible for asylum.  The IJ denied withholding of removal on the ground that "women who have been forced to work for the cartel who are skilled labor" and "women forced to work for the cartel because of their specialized skills who have subsequently refused to work for the cartel" did not qualify as particular social groups.  The IJ failed to discuss Plancarte's proposed social group of "female nurses."  The IJ denied CAT relief on the ground that Plancarte had not established that it was more likely than not that she would be tortured by, or with the acquiescence of, a Mexican public official.  The IJ wrote, "There is no evidence that public officials were involved in her being pressed into servitude for the cartel as a nurse."

On appeal, the BIA held that the IJ erred by not considering Plancarte's proposed particular social group of

---

[1] Plancarte argues she is eligible for an exception to the one-year filing deadline under *Mendez-Rojas v. Johnson*, No. C16-1024, 2017 WL 1397749 (W.D. Wash. Jan. 10, 2017).  The government does not dispute this.

"female nurses," but that the error was harmless.  In the view of the BIA:

> In light of prior precedent decisions, gender can be an immutable characteristic. . . . However, with respect to "nurses," or the portion of that group regarding nurses, we discussed a similar claim in *Matter of Acosta*, 19 I&N Dec. at 211, regarding members of a taxi collective who refused to participate in a guerilla-sponsored work stoppage.  We held that neither of these characteristics is immutable because the group members could avoid the threats either by changing jobs or by cooperating in the work stoppages.  *Matter of Acosta*, 19 I&N Dec. at 234.

"[E]ven assuming the respondent's eligibility to apply for asylum," the BIA found no nexus to a particular social group. Because Plancarte had not established a particular social group, the BIA affirmed the IJ's denial of both asylum and withholding relief.  The BIA affirmed the IJ's denial of CAT relief on the ground that "respondent did not show that she is more likely than not to be tortured, by or with the acquiescence . . . of a government official upon return to Mexico."  The BIA wrote, "The Immigration Judge . . . noted that there is no evidence that Mexican public officials were involved in the respondent being pressed into service for a criminal organization as a nurse."

## II.  Standard of Review

Our review is limited to the BIA's decision except where the IJ's opinion is expressly adopted.  *Cordon-Garcia v. INS*,

204 F.3d 985, 990 (9th Cir. 2000). We review legal conclusions *de novo*. *Davila*, 968 F.3d at 1141. We review for substantial evidence factual findings underlying the BIA's determination that a petitioner is not eligible for asylum, withholding of removal, or CAT relief. *Id.* To prevail under the substantial evidence standard, the petitioner "must show that the evidence not only supports, but compels the conclusion that these findings and decisions are erroneous." *Id.*

## III.  Discussion

### A.  Venue

On March 10, 2017, Plancarte moved to change venue from Salt Lake City, Utah (in the Tenth Circuit) to Boise, Idaho (in the Ninth Circuit). The IJ granted the motion on April 10, 2017. The Portland, Oregon, Immigration Court initially had administrative control over the Boise location but at some point the Salt Lake City, Utah, Immigration Court assumed administrative control of the case. In April and June 2017, after the IJ granted the motion to change venue to Boise, final hearing notices were sent to Plancarte. Although the notices for the next two hearings were issued by the Utah Immigration Court, the designated hearing location was Boise. The final hearing, like the earlier hearings, was conducted remotely. At that hearing, the IJ and counsel for the government were in Salt Lake City. Plancarte, her counsel, and the interpreter were in Boise.

All orders were entered in the name of the Utah Immigration Court, but the IJ specified that proceedings were "being conducted at the Salt Lake City Court's Boise Idaho hearing location." The relevant statute, 8 U.S.C.

§ 1252(b)(2), provides: "The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." We must determine whether the proceedings were "completed" in Boise or Salt Lake City.

In *Yang You Lee v. Lynch*, 791 F.3d 1261, 1262 (10th Cir. 2015), the IJ conducted proceedings by video conference from an Immigration Court in Dallas, Texas (in the Fifth Circuit). For most of his Immigration Court hearings, Lee was in Oklahoma (in the Tenth Circuit). *Id.* During the penultimate hearing, the IJ told Lee that he would be transported to Dallas for the final hearing, and that the address of the Dallas Immigration Court would appear at the top of the final hearing notice. *Id.* The notice for the final hearing included the address of the Dallas Immigration Court, but listed an Oklahoma City address as the location for the hearing. *Id.* at 1262–63. In fact, however, Lee's final hearing occurred at a Dallas Immigration Court, where Lee was physically present. *Id.* at 1263. The IJ issued his final order of removal from the Dallas Immigration Court. *Id.*

The Tenth Circuit held that the Fifth Circuit was the proper venue because "venue began and remained in Dallas." *Id.* at 1265. The court noted that "the IJ held the final hearing in Dallas, Texas; Mr. Lee and the government's representative physically appeared in Dallas for the final hearing; and the IJ issued his final order from the Dallas Immigration Court." *Id.* at 1264.

*Lee* is distinguishable from this case. Unlike in *Lee*, the IJ in this case formally transferred venue from Salt Lake City to Boise. Thereafter Plancarte never physically appeared in Salt Lake City. Rather, she remained in Boise. The IJ

indicated that proceedings were conducted in Boise, and the BIA held that proper venue is in the Ninth Circuit. Finally, both final hearing notices designated Boise as the location for the final hearing. The statute expressly allows any of the participants in a removal hearing to appear at the designated hearing location by "video conference," *see* 8 U.S.C. § 1129a(b)(2)(A)(iii), and here the IJ and the government attorney elected to do so.

A 2007 proposed regulation of the Executive Office for Immigration Review provides that "venue shall lie at the place of the hearing as identified on the charging document or initial hearing notice, unless an immigration judge has granted a change of venue to a different location." *Jurisdiction and Venue in Removal Proceedings*, 72 Fed. Reg. 14494, 14494 (Mar. 28, 2007). "[T]he designated hearing location remains unaffected even if an immigration judge from a different location is conducting the hearing by video conference, or if the records in the case are filed with, and maintained by, an administrative control court in a different city." *Id.* Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), a proposed regulation is "entitled to respect" if it has the "power to persuade."

The *Lee* court declined to defer to the proposed regulation because it would have resulted in an anomaly—namely, that venue would have been in the Tenth Circuit because the final hearing notice listed Oklahoma City as the final hearing location even though the record showed that the IJ conducted the proceedings from Dallas, where Lee was present for the final hearing. *Lee*, 791 F.3d at 1266. Here, by contrast, the proposed regulation addresses the precise situation at issue. As contemplated by the proposed regulation, once venue was

transferred to Boise, it remained there despite the fact that the IJ was in Salt Lake City.

We therefore conclude that venue under 8 U.S.C. § 1252(b)(2) is proper in the Ninth Circuit.

### B. Asylum and Withholding of Removal

An applicant for asylum and withholding of removal bears the burden of establishing eligibility. 8 U.S.C. §§ 1158(b)(1)(B)(i), 1229a(c)(4)(A). To be eligible for asylum, the applicant must show that "(1) [her] treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010); *see also* 8 U.S.C. § 1101(a)(42)(A). To be eligible for withholding of removal, an applicant must demonstrate that her life will be "threatened in that country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

The IJ and the BIA found Plancarte's removal hearing testimony credible. The government makes no argument contrary to that finding. Nor does the government argue that Plancarte's testimony and other evidence fail to persuasively establish the truth of her narrative as it relates to the issues before us concerning her asylum and withholding claims. *See Dai*, 141 S. Ct. at 1680–81.

Both asylum and withholding depend on a finding that the applicant was harmed, or threatened with harm, on account of a protected ground. One such ground is that the applicant is

a member of a particular social group. An applicant who requests asylum or withholding of removal based on membership in a particular social group must establish that the group is: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Reyes v. Lynch*, 842 F.3d 1125, 1131 (9th Cir. 2016) (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014)).

"The term 'particular social group' is ambiguous." *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc). "The BIA's construction of ambiguous statutory terms in the [Immigration and Nationality Act] through case-by-case adjudication is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)." *Id.* at 1087. Under *Chevron*, we must accept reasonable constructions of ambiguous statutory terms, "even if we believe the agency's reading is not the best statutory interpretation." *Id.*; *see also Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1076 (9th Cir. 2020) ("Because we have already concluded that the phrase 'particular social group' is ambiguous, we must adhere to an agency interpretation of that term, so long as it is reasonable." (citation omitted)).

The BIA has specified the elements of a particular social group in *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014), and *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014). Relevant to the petition before us, the BIA has defined "immutable" to mean a characteristic "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of W-G-R-*, 26

I. & N. at 212 (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). The "critical requirement" is that the defining characteristic of the group be something that "either cannot be changed" or "should not be required to [be] change[d] in order to avoid persecution." *Id.* at 213.

Here, the BIA concluded that "female nurses" are not a cognizable "particular social group" because being a nurse, like being a taxi driver, is not an immutable characteristic. However, rather than provide any meaningful analysis about the immutability of "female nurses," the BIA simply cited *Matter of Acosta*, 19 I. & N. Dec. at 233. This alone was error. *See Diaz-Reynoso*, 968 F.3d at 1086 ("The dissent's reliance on these decisions reflects its mistaken premise that the rejection of a social group in one case suggests that a similar group may be rejected summarily in another. . . . [This] contravenes binding authority establishing that whether a particular social group is cognizable 'requires a fact-specific inquiry based on the evidence in a particular case.'") (quoting *Matter of L-E-A-*, 27 I. & N. Dec. 581, 591 (A.G. 2019), *vacated on other grounds by* 28 I. & N. Dec. 304 (A.G. 2021)); *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("To determine whether a group is a particular social group for the purposes of an asylum claim, the agency must make a case-by-case determination as to whether the group is recognized by the particular society in question.").

Further, there are significant—and determinative— differences between *Acosta* and this case. In *Acosta*, the petitioner argued that he was a member of a particular social group comprising members of a taxi driver cooperative in El Salvador. 19 I. & N. Dec. at 232. The BIA rejected the claimed group after finding that the identifying characteristics

of the group—working as a taxi driver and refusing to participate in guerrilla-sponsored work stoppages—were not immutable because group members could avoid the asserted harm by either changing jobs or cooperating with the work stoppages. *Id.* at 234.

In contrast to *Acosta*, Plancarte cannot avoid compulsion by the cartel simply by changing jobs, because even if she ceased *employment* as a nurse, she would still *be* a nurse. Plancarte has received specialized medical training and has a professional license as a nurse. The cartel targeted Plancarte precisely because of her specialized nursing skills. It threatened her and her family with torture and death to force her to use those skills to provide medical treatment to the cartel.

As a licensed nurse, Plancarte is in a very different position from a taxi driver. Unlike the skills necessary to drive a car, possessed by most adults, professional nursing skills are not shared by the general population. Plancarte's skills make her uniquely valuable to the cartel in a way that taxi drivers are not. Even if she changed her profession, she would still remain valuable to the cartel because she would retain her medical knowledge and nursing skills. Thus, regardless of whether she would continue to work as a licensed nurse, she would remain a target of the cartel. Plancarte is therefore unlike the taxi drivers in *Acosta*. She lacks "the power to change" the immutable nursing characteristics— her medical knowledge and nursing skills—that make her important to the cartel.

We hold that the BIA's conclusion that the proposed particular social group of "female nurses" lacks an immutable characteristic was unreasonable. We therefore grant the

petition with respect to Plancarte's asylum and withholding of removal claims, and remand for consideration of the other required characteristics of her proposed particular social group of "female nurses." Because the BIA did not reach other questions relevant to Plancarte's asylum and withholding claims, we also do not reach them.

## C.  CAT Relief

To establish entitlement to protection under CAT, an applicant must show "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1284 (9th Cir. 2001). The torture must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

The IJ concluded that Plancarte was ineligible for CAT relief because she failed to show that it was more likely than not she would be tortured in Mexico by, or with the consent or acquiescence of, a public official. The BIA affirmed the IJ, concluding that Plancarte had not shown government involvement or acquiescence.

The IJ and the BIA found Plancarte's removal hearing testimony credible. The government makes no argument contrary to that finding. However, the government argues that Plancarte's evidence of acquiescence or involvement by Mexican public officials, though credible, is nonetheless insufficient to carry her burden of proof as it relates to her CAT claim. *See Dai*, 141 S. Ct. at 1680–81.

"Where the Board does not consider all the evidence before it, either by 'misstating the record [or] failing to mention highly probative or potentially dispositive evidence,' its decision cannot stand." *Castillo v. Barr*, 980 F.3d 1278, 1283 (9th Cir. 2020) (alteration in original) (quoting *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011)); *see also* 8 C.F.R. § 208.16(c)(3) (requiring the BIA to consider "all evidence relevant to the possibility of future torture"); *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010) ("The failure of the IJ and the BIA to consider [relevant evidence] constitutes reversible error."). "Relevant evidence includes the petitioner's testimony and country conditions evidence." *Parada v. Sessions*, 902 F.3d 901, 915 (9th Cir. 2018). A petitioner's credible testimony "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2). Where, as here, the BIA does not expressly state that it conducted *de novo* review and its order indicates it gave the IJ's decision significant weight, we will review the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) (citation omitted).

Relying on the findings of the IJ, the BIA concluded that Plancarte had not shown a likelihood of torture with the acquiescence or involvement of government officials. The BIA's conclusion ignores uncontradicted record evidence showing both acquiescence and direct involvement.

The relevant evidence includes Plancarte's written application and oral testimony, exhibits, and 2016 country conditions reports. Plancarte wrote in her asylum application and testified that the police were involved in the medical care of cartel members, and that law enforcement corruption is a serious and widespread problem in Mexico. She also

submitted country condition evidence corroborating her testimony. Critically, the agency concluded that there was "no evidence" that "Mexican public officials were involved" in Plancarte's "being pressed into service for a criminal organization as a nurse." That conclusion is directly contradicted by evidence in the record. Plancarte's written application states that the Mayor recommended she be hired by the hospital because he wanted her to provide medical treatment to cartel members.

Here, the record does not "contain[] contrary evidence of a kind and quality that a reasonable factfinder could find sufficient." *Dai*, 141 S. Ct. at 1677 (citation and internal quotation marks omitted). We hold that, on this record, substantial evidence compels the conclusion that there was official involvement and acquiescence in the cartel forcing Plancarte to provide medical treatment to cartel members. *See id.* at 1679 (citing 8 U.S.C. § 1252(b)(4)(B)). We therefore grant Plancarte's petition with respect to CAT, and remand for a determination whether the likelihood of torture if she were returned to Mexico is sufficient to warrant CAT relief.

## D. Due Process

Plancarte last argues that the BIA denied her due process when it failed to remand her case to the IJ for failure to admit key evidence. We lack jurisdiction to consider this argument because Plancarte failed to exhaust it. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004).

### Conclusion

We grant Plancarte's petition for review. With respect to asylum and withholding of removal, we remand to allow reconsideration of Plancarte's proposed particular social group, and to allow the agency to reach other issues it has not yet addressed. With respect to CAT, we remand for a determination whether the likelihood of torture is sufficient to warrant relief.

**Petition GRANTED and REMANDED.**